IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| In re:<br><br>JCE DELAWARE, INC.,<br><br>Debtor. | CHAPTER 11 CASE<br><br>CASE NO. 11-11926-cag<br><br>Joint Administration Request Pending |

**DECLARATION OF BLAKE KUHLMAN**
**IN SUPPORT OF FIRST DAY MOTIONS**

I am Blake Kuhlman. I am over the age of 18 and competent to testify to the facts stated herein. This declaration is submitted in support of the so-called "first day motions" filed in the above captioned bankruptcy as described herein. If called to testify in connection with the motions, I would state as follows:

1. Since 1989, I have been the President, Director, and chief executive officer (or equivalent position in the case of the limited liability and limited partnership entities) of each of the debtors in these bankruptcies, i.e. J.C Evans Construction Holdings, Inc., a Texas corporation, J.C. Evans Construction Co., L.P., (a/d/b/a American Aggregates), Adkins Land Development, L.P., J.C. Evans Nevada, LLC, JCE Delaware, Inc., and Equus Development, Inc. (collectively referred to as "JC Evans Construction" or "Debtors"). I am actively involved on a daily basis in running the business operations of the Debtors. Based on my position with the Debtors, I have personal knowledge of the facts stated herein or have derived the facts from my review of the books and records of the Debtors.

2. With roots stretching back over 55 years, the Debtors, collectively, are a large Texas based heavy equipment construction company with offices near Austin. The Debtors have two main areas of operations. First, through J.C. Evans Construction Co., L.P., a Texas limited

1

partnership a/d/b/a/ American Aggregates (the "Construction Company") they own and operate a construction company specializing in heavy site preparation on commercial, pipeline, utility and highway projects, including excavating, trenching, site preparation and construction. Second, through Adkins Land Development, L.P., a Texas limited partnership, (the "Quarry Company") they own a 700 acre quarry producing over 1 million tons of aggregate and dimension stone. The quarry is located on two non-contiguous tracts in Williamson County. The quarry is operated by the Construction Company. For 2010, the Debtors had gross revenues of approximately $160 million. They currently employ approximately over 400 individuals, and own or lease several hundred pieces of heavy equipment consisting of backhoes, trenching machines, graders, rock saws, etc. They operate from a 20,000 sf facility near Leander, Texas, northwest of Austin in Williamson County.

3. J.C. Evans Construction Holdings, Inc., a Texas corporation (the "Holding Company") is the holding company that owns directly or indirectly each of the other Debtors. In turn, the Holding Company is owned by a Texas trust for the benefit of the current and former employees of the Debtors through an Employee Stock Ownership Plan.

4. More specifically, JCE Delaware, Inc. is the 99% limited partner owner of the Construction Company and Quarry Company. JCE Nevada, LLC is the 1% general partner owner of the Construction Company. Equus Development, Inc. is the 1% general partner owner of the Quarry Company. In turn, The Holding Company is the 100% owner of JCE Delaware, Inc., JCE Nevada, LLC, and Equus Development, Inc.

5. Collectively, through direct promissory note obligations or guarantys, the Debtors allegedly owe an aggregate of approximately $23 million of mostly if not entirely secured indebtedness to First State Bank Central Texas (the "Bank"). Trade debt is approximately $15

million, a significant portion of which may be covered by the payment and performance bonds issued by the Bonding Companies.

6. The Debtors construction operations consist of bonded and non-bonded projects. Bonding is provided through Liberty Mutual Insurance company and Safeco Insurance company (collectively, the "Bonding Companies"). Since early 2011, the Bonding Companies have advanced approximately $22 million on bonded projects.

7. Prompted by significant commercial development throughout Texas in the period leading up to 2008, the Debtors invested heavily in new equipment, thereby taking on an increased debt load both through equipment lease and purchase obligations and through Bank lending. When the economy dramatically shrunk in late 2008 and stayed at significantly reduced levels in the past two years, the Debtors experienced serious strains on their operations. They have downsized their employee base, cut salaries, and aggressively marketed their services in order to survive the downturn.

8. During 2011, significant disputes arose between the Debtors, the Bank and the Bonding Companies over attempts to complete existing projects and restructure the Debtor's operations. The Bank recently posted the Debtors' key real estate assets, including the quarry, for foreclosure. If allowed to proceed, the foreclosures would drain significant equity value away from the Debtors to the detriment of creditors generally. Thus, the bankruptcy cases were filed to stop the foreclosures, preserve the assets' equity value for creditors generally, allow the Debtors to both restructure financially and continue operations, and incident thereto, allow them to conduct an orderly sale of the quarry assets and use the proceeds to make significant payments to the Bank, the Bonding Companies and perhaps other creditor groups.

9. In my opinion and based on my knowledge of the assets at issue, the Debtors have significant multi-million dollar equity in excess of the Bank debt collectively in the quarry, in approximately 28 acres of land on which the Debtor's operating headquarters are located in Leander, Texas, and in the equipment owned and leased by the Debtors.

**Motion to Use Cash Collateral and secure DIP Financing**.

10. The Debtors have filed a motion to use cash collateral and to secure Debtor-in-possession financing. I have reviewed the terms of the motion and believe that the relief sought therein is in the best interests of the debtor. Specifically, the Debtors have four main sources of income. By far the largest source of income is the receivables on bonded and non-bonded jobs. While the pace of collections varies each month depending both on the activity at various job sites but also on the payment structure of each job, generally receivables from construction projects each month range from $6 to $10 million. Second, the Debtors generate income from quarry operations. Currently, this source is at a level of approximately $350,000 per month in outside sales, on average. Third, the Debtors are in the process of selling excess heavy equipment. After paying the holders of purchase money security interests, these sales generate equity for the company that, in turn, allows the Debtors to pay additional amounts of Bank debt. Finally, the Debtors have retained professional brokers to market the quarry and believe that its sale, alone, should generate sufficient equity to pay in full the Bank debt and provide significant multi-million dollar remaining equity with which to help repay significant portions of the Bonding Company advances and the unsecured debts. The headquarters building complex consisting of approximately 28 acres also has significant value of approximately $7 million, which if sold, would further provide a source from which any remaining Bank debt could be paid and/or applied to reduce the advances by the Bonding Companies and/or for unsecured debt.

11. All of the assets of the Debtors, including the receivables, equipment and real estate assets are pledged to both the Bank and the Bonding Companies. Generally, the Bank has a first lien in the real estate assets (quarry and headquarters building), and in most of the equipment (over any purchase money type security interests), and in the receivables on non-bonded jobs. The Bonding Companies have a first lien on receivables from the bonded jobs and a second lien on the remaining assets of the Debtors. Currently, approximately 95% of the construction projects are bonded projects.

12. The cash collateral/DIP financing motion seeks permission to use the postpetition collections on receivables and any equipment net sale proceeds to fund the postpetition construction work by the Debtors and to cover the administrative costs of the bankruptcy proceedings. The Debtors have agreed with the Bonding Company on a budget for these amounts, which in my judgment should be sufficient to allow for the smooth continuation of the existing construction projects. As equipment sales continue, the net proceeds will augment the receivable collections and provide a much needed cushion to the income of the Debtors to smooth uneven receivable collections. Continued use of the postpetition receivables collection is absolutely critical to the continuation of the Debtors' operations. Without it, the Debtors will be forced to immediately cease all operations.

13. Because of the uneven pace of receivable collections, it is critical to have a financing source separate from the receivables. As all of the assets are currently pledged, it is not feasible for the Debtors to arrange for third party financing from any source. Based on my knowledge of the construction industry, any additional financing is available only if the Debtors can provide first priority collateral protection. Moreover, the time needed for any third party source to evaluate the Debtors' operations and assets as part of a due diligence program is such

that approaching a third party for such financing, even on a first priority basis, is impracticable. Accordingly, we have negotiated with the Bonding Companies that are very familiar with the Debtors' operations and assets to obtain $2.5 million in debtor in possession financing, for a four week term. This credit facility, if approved, would allow the Debtors to draw amounts needed to pay all postpetition costs during the term of the facility on all construction projects (bonded and non-bonded) and to operate the overall business of the Debtor and pay the administrative costs of the bankruptcy.

14. More importantly, the DIP facility would allow the Debtors to make significant progress in the sale of its quarry assets in an orderly manner. As noted, I believe that the sale of this asset is a critical part of the Debtors' bankruptcy plans and should allow the Debtors to fully pay the Bank indebtedness, repay the DIP facility, and make significant reductions in the secured debt owed to the Bonding Companies.

15. The DIP facility with the Bonding Companies has been negotiated at arm's length and in good faith by both parties, and I believe its terms are fair and reasonable to the Debtors. I recommend that it be approved.

**Motion to Pay Prepetition Wages**

16. The Debtors employ approximately 445 construction workers currently employed at over 14 job sites throughout Texas, and other employees at the Debtors' main operations plant. Most of these workers are paid on an hourly basis, once a week, in arrears. The remaining employees of the Debtors are salaried employees paid twice every month. The last payroll before the petition date for hourly workers was Friday, July 29, 2011 and covered the pay period from July 18 through July 24. The last payroll before the petition date for salaried employees was through July 31, 2011. The motion to pay prepetition wages asks permission to pay the

accrued but not yet due wages, and certain accrued employee benefits (vacation pay, reimbursable expenses, etc ) for the hourly workers, and for salaried employees to pay similar benefits for reimbursable expenses, paid time off and vacation pay, etc.

17. As detailed in the motion, the prepetition payroll compensation owed is less than $1,000 per person for approximately 400 employees. Twenty eight employees are owed between $1,000 and $2,500, and 16 are owed more than $2,500 prepetition. However, none of the employees are owed more than $4,200, and all are thus owed less than the priority amounts granted by the Bankruptcy Code. The aggregate prepetition compensation sought to be paid in the motion is approximately $280,000.

18. In addition to these payments to the employees, the sum of $60,000 in payroll taxes and other deductions (social security, Medicare, federal income taxes and unemployment taxes) are owed prepetition. The motion seeks permission to make these payroll payments to the relevant governmental authorities.

19. Finally, the motion seeks permission for the bank handling the payroll accounts to continue to process and pay prepetition payroll checks.

20. In my judgment, the continuation of payroll payments requested in the motion is absolutely critical to the continued operations and success of the Debtors. Failure to pay the amounts owed will devastate morale, impede the ability of the Debtors to keep construction jobs running smoothly and untimely increase costs to the estate while it crafts alternative solutions for employees no longer willing to trust the Debtors ability to make payments to them. Further, I know the circumstances of many of the workers and employees, and any disruption in their anticipated income will cause serious hardship in most cases. I strongly recommend the motion be granted for the benefit of the Debtors and their employees.

**Motion to Maintain Existing Bank Accounts**

21. The Debtors deal with hundreds of subcontractors on on-going jobs through Texas. It centralizes its bank accounts in Bank of America. The Debtors have filed a motion seeking permission to maintain its existing bank accounts at Bank of America, but to note on checks issued postpetition that the companies are now operating as Debtors in Possession.

22. The reason for this request is that it would be very disruptive and cumbersome to close the existing accounts and re-open new DIP accounts. Particularly because of the number and wide-spread nature of subcontractors on the job sites, a change in existing bank accounts would, in my judgment, cause considerable confusion and delay in receiving payments on jobs and in making payments to subcontractors during the critical first few weeks of these bankruptcies.

23. Accordingly, in my judgment, maintaining the existing bank accounts (but noting on checks that the companies are operating as Debtors-in-Possession is in the best interests of the Debtors. I request the motion be granted.

Signed under penalty of perjury on August 1, 2011.

_____
Blake Kuhlman