IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § § | CHAPTER 11 CASE |
| JCE DELAWARE, INC., et al., | § § | CASE NO. 11-11926 |
| Debtors. | § § § § | (Joint Administration Pending) |

**MOTION FOR INTERIM AND FINAL PERMISSION FOR THE DEBTORS TO USE CASH COLLATERAL AND OBTAIN DEBTOR IN POSSESSION FINANCING, AND GRANTING ADEQUATE PROTECTION, SUPERPRIORITY CLAIMS AND PRIMING LIENS**

Come now JCE Delaware, Inc., J.C Evans Construction Holdings, Inc., a Texas Corporation, J.C. Evans Nevada, LLC, EQUUS Development Inc., J.C. Evans Construction Co. LP, and Adkins Land Development, LP" (collectively, the "Debtors") and file this *Motion For Interim and Final Permission to Use Cash Collateral and Obtain Debtor in Possession financing, and Granting Adequate Protection, Superpriority Claims and Priming Liens* (the "Motion"), and would show as follows:

## I. PRELIMINARY STATEMENT

1. JC Evans Construction Co., L.P. and Adkins Land Development, L.P. own and operate a heavy equipment construction firm and a rock quarry. A full description of the Debtors operations and history is set forth in the *Declaration of Blake Kuhlman in Support of First Day Motions*, filed herein. To continue their operations in an orderly manner on a post petition basis, the Debtors need to use funds from operations and to obtain Debtor in Possession loans from Liberty Mutual Insurance Company/Safeco (the "Bonding Company"). By this Motion, the Debtors hereby seek entry of an order permitting them to use funds generated from their business

operations to complete existing construction contracts and operate the Quarry (defined below). Further, the Debtors seek permission to borrow on a post petition basis as Debtor in Possession financing up to $2.5 million from the Bonding Company ("DIP Financing") to pay any shortfalls in the costs of completing the existing construction projects and operating the Debtors.

2. First State Bank of Central Texas (the "Bank") is owed approximately $23 million pursuant to various promissory notes and overdrafts, and alleges that it holds a first lien on most of the Debtors' assets, excluding accounts receivables related to bonded jobs. The Bonding Company advanced approximately $22 million to the Debtors prepetition to assist with the completion of approximately 20 bonded construction projects. The Bonding Company alleges it holds a first lien on receivables from the bonded jobs and a second lien on virtually all of the remaining assets of the Debtors. Traditionally, approximately 95% of the Debtors' revenues are from bonded jobs. By this Motion, the Debtors seek permission to use such property, including post petition collections on all accounts receivable, conditioned on a grant of adequate protection. The Bonding Company and the Bank will be protected by replacement liens on assets produced by the Debtors' post-petition operations and a continuation of their prepetition liens on all other assets in the same priority as existed prepetition.

3. To obtain the requested DIP Financing, the Debtor proposes to grant to the Bonding Company as security therefore (i) a superpriority administrative claim, (ii) a junior lien on any unencumbered property of the estate, and (iii) a lien on the estate's real property that is pari passu with the Bank. The debtors' real estate consists principally of a 700 quarry in Williamson County and approximately 28 acres in and around the Debtors' operating facility in Leander, Texas, Williamson County. The value of these real estate assets are believed by the Debtors to far exceed the aggregate amounts owed to the Bank. The Bank also has lien claims

**2**

on certain heavy equipment that, in the aggregate, has millions of dollars of equity value. Thus the Bank appears to be significantly over secured and thus not prejudiced by the proposed pari passu lien treatment.

## II. JURISDICTION AND VENUE

4. The Debtors commenced the cases by filing petitions for relief on August 1, 2011. This Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D)and (M). Venue is proper in the Austin Division of the Western District of Texas as the Debtors are headquartered in Leander, Williamson County, Texas and most of their assets are located there as well.

## III. BACKGROUND

*The Debtors*

5. With roots stretching back over 55 years, the Debtors, collectively, are a large Texas based heavy equipment construction company with offices near Austin. The Debtors have two main areas of operations. First, through J.C. Evans Construction Co., L.P., a Texas limited partnership d/b/a/ American Aggregates (the "Construction Company"), they own and operate a construction company specializing in heavy site preparation on commercial, pipeline, utility and highway projects, including excavating, trenching, site preparation and construction. Second, through Adkins Land Development, L.P., a Texas limited partnership, they own a 700 acre quarry (the "Quarry"), which produces aggregate for use in road construction. The Quarry is located on two non-contiguous tracts in Williamson County, is operated by the Construction Company. For 2010, the Debtors had gross revenues of approximately $160 million. They currently employ approximately 400 individuals, and own or lease several hundred pieces of heavy equipment consisting of backhoes, trenching machines, graders, rock saws, etc. They operate from a 20,000 square foot facility near Leander, Texas, northwest of Austin in

Williamson County. J.C. Evans Construction Holdings, Inc., a Texas corporation (the "Holding Company") is the holding company that owns directly or indirectly each of the other Debtors. In turn, the Holding Company is owned by a trust for the benefit of the current and former employees of the Debtors through an Employee Stock Ownership Plan (the "ESOP").

6. Trade debt is approximately $15 million, much of which is on bonded construction projects.

7. The Debtors' construction operations consist of bonded and non-bonded projects. Bonding is provided through the Bonding Company.

8. Prompted by significant commercial development throughout Texas in the period leading up to 2008, the Debtors invested heavily in new equipment, thereby taking on an increased debt load both through equipment lease and purchase obligations and through Bank lending. When the economy dramatically shrunk in late 2008 and stayed at significantly reduced levels in the past two years, the Debtors experienced serious strains on their operations. They have downsized their employee base, cut salaries, and aggressively marketed their services in order to survive the downturn.

9. During 2011, significant disputes arose among the Debtors, the Bank and the Bonding Company over attempts to complete existing projects and restructure the Debtors' operations. The Bank recently posted the Debtors' key real estate assets, including the Quarry, for foreclosure. If allowed to proceed, the foreclosures would drain significant value from the Debtors to the detriment of creditors generally. Thus, the bankruptcy cases were filed to stay the foreclosures, while preserving the value of the Debtors' assets and operations and allowing the Debtors to restructure financially, continue operations, and, incident thereto, conduct an orderly

sale of the Quarry assets to pay down indebtedness owed to the Bank, the Bonding Company and perhaps other creditor groups.

*Capital Structure*

10. The Debtors are ultimately owned by an ESOP created on June 5, 1995. The ESOP through a trust owns the Holding Company, which, in turn, owns 100% of JC Evans Nevada LLC, JCE Delaware, Inc. and EQUUS Development, LP. JC Evans Nevada LLC is a 1% owner of JC Evans Construction Co., LP and JCE Delaware, Inc is the 99% owner of JC Evans Construction Co., LP. JCE Delaware, Inc. also owns 99% of Adkins Land Development, LP (the other 1% is owned by EQUUS Development, Inc., general partner.)

*Validity of Liens and Claims*

## IV. RELIEF REQUESTED

11. By filing this Motion, the Debtors respectfully request permission from this Court to use cash collateral in which the Bank and Bonding Company assert an interest from the Petition Date through, and including, a final hearing on this Motion (the "Interim Period"), to provide the Bank and Bonding Company with adequate protection to the extent of any diminution in the value of their respective interests in the cash collateral. The budget attached as Exhibit "A" (the "Budget") identifies the Debtors' estimate of their ordinary and necessary expenses to be incurred and paid during first month of the bankruptcy cases. The budget separately describes income and expenses on bonded jobs, and income and expenses from other sources including the quarry operations and non-bonded jobs.

12. Specifically, the Debtors request permission to use cash collateral pursuant to an agreed budget, as it may be amended from time to time by the Bonding Company and the Debtors (with notice to the Bank and other parties in interest) to fund post petition operations and

pay the costs of administering these bankruptcies. In return, the Debtors propose to provide the following protections:

(a) Cash Collateral Adequate Assurance: Post petition replacement liens on the accounts receivables generated from post petition collections of receivables, and continuation of prepetition liens with the same effect, priority and security as existed prepetition.

(b) DIP Financing Loan:

(i) Superpriority administrative claim for amount of DIP loan advances'

(ii) lien on unencumbered assets and junior lien on all other assets;

(iii) lien on real estate assets as to which the Bank has a first lien, on a pari passu basis with the Bank.

13. A proposed form of order granting the requested relief is attached as Exhibit "B". Note that this draft order has not yet been agreed to by the creditors and proposed DIP lender. Based on discussion to date, the Debtors believe that the Bonding Company is willing to allow use of its cash collateral and to make the DIP Financing loan essentially on the terms described herein, as they will be more fully defined in the order granting this motion.

## V. ARGUMENTS AND AUTHORITY

14. Section 363(c) of the Bankruptcy Code provides that a debtor-in-possession may use cash collateral if all interested entities consent or the court, after notice and a hearing, authorizes such use. Section 363(e) of the Bankruptcy Code requires that the use of cash collateral be prohibited or conditioned as is necessary to provide adequate protection to persons that have an interest in cash collateral. *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("Adequate protection is . . . grounded in the belief that secured creditors should not be deprived of the benefit of their bargain"). Read together, sections 363(c) and (e) of the Bankruptcy Code authorize a debtor-in-possession to use the cash collateral of a secured creditor if such creditor's collateral is adequately protected. *See In re Harrington & Richardson, Inc.*, 48

**6**

B.R. 431, 433 (Bankr. D. Mass. 1985) (finding that the court may authorize the use of cash collateral upon a showing that those with an interest in the cash collateral are adequately protected).

15. Although the term "adequate protection" is not precisely defined in the Bankruptcy Code, section 361 sets forth three non-exclusive examples of what may constitute adequate protection: (1) periodic cash payments equivalent to the decrease in value of the creditor's interest in the property; (2) an additional or replacement lien on other unencumbered property of the debtor; or (3) other relief that provides the indubitable equivalent of the creditor's property interest. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1388 (5th Cir. 1986). "[T]he debtor-in-possession has the burden of proof on the issue of adequate protection." *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003).

16. The Bank and Bonding Company respective interests in the Cash Collateral are "adequately protected" within the meaning of section 361 and "preserved" within the meaning of section 506(c) because the cash collateral will be used to pay for operations of the construction business. Continued operations aid these secured creditors in several ways. First, the operations will generate post petition receivables and enhance pre petition collections on prior work; second, continued operations will allow the Debtors to more fully maintain the condition of existing assets such as the hundreds of items of heavy equipment and the improvements on the real property, and the operations at the quarry, all of which are other assets of these creditors., Making these expenditures will result in a stable and continuous stream of cash flow, thereby enhancing and preserving the value of the Debtors' operations and providing adequate protection to the Bank. *See McCombs Props. VI, Ltd. v. First Tex. Sav. Ass'n (In re McCombs Props. VI,*

*Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (finding that, by committing cash collateral to pay operating expenses and to improve and maintain real property, the debtor "substantially eliminated the risk of diminution" of the secured creditor's interest in cash collateral).

17. Bankruptcy Rule 4001(b) permits a court to approve use of cash collateral during the 15-day period following the filing of a motion only to the "extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Here, the Debtors require immediate access to the cash collateral to, among other things, maintain the value of their contracts. If interim relief is not obtained, the Debtors' efforts to pay its employees and assure vendors of continued payments on existing jobs will be virtually impossible, and the business will likely simply close. Accordingly, the Debtors request that the Court authorize the Debtors to immediately use the cash collateral in the amounts set forth in the Budget, pending a final hearing. At the final hearing, the Debtors request that the relief requested herein be granted on a permanent basis..

18. The Debtors have been unable to obtain new sources of financing. Similarly, the Debtors have been unable to find parties willing to advance funds in exchange for administrative expense claims. Based on the Debtors decades of experience in the construction industry, it believes that it will be impossible to find a DIP lender on an interim basis, and virtually impossible to find such a lender on any reasonable terms on a final basis. Indeed, using the existing Bonding Company as the DIP lender is practical and efficient given its thorough knowledge of the Debtor's operations.

19. Section 364(c) authorizes the Debtors to incur debt post-petition as requested herein. If a debtor-in-possession is unable to obtain unsecured credit allowable as an administrative expense, the Bankruptcy Code authorizes such debtor-in-possession to incur debt

secured by a lien on unencumbered property of the estate or secured by junior liens on other property of the estate already subject to liens. *See* 11 U.S.C. § 364(c)(2)&(3).

20. The Debtors' quarry, accounts receivable, equipment and inventory as well as certain real estate are property of the estate. *See id.* § 541(a).

21. Such authorization is in the best interests of the estates, the Bank, the construction vendors, and all other creditors for the reasons described herein. The best value for the Debtor will be realized if it is able to complete ongoing construction work and avoid incurring delay damages claims, and/or rejection damages claims. Moreover continuing operations at the quarry will build value by filling orders and increasing inventory pending a sale. The Debtor has considered alternatives however, no realistic alternative exists. The Bonding Company is the only party situated to have a strong incentive to complete the bonded construction projects and advance to pay for same.

## VI. NOTICE

22. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel for each of the Bank and the Bonding Company; (c) the twenty (20) largest unsecured creditors of each Debtor's respective estate; (d) those persons who have formally appeared and requested notice in this case pursuant to Bankruptcy Rule 2002; and (e) the Internal Revenue Service and other governmental entities required to receive notice under the Bankruptcy Rules or the Local Rules. The Debtors submit that no other or further notice need be provided.

## VII. PRAYER

WHEREFORE, the Debtors respectfully request that this Court enter an Order granting the requested relief on an interim basis, and after a final hearing, granting it on a permanent basis, and such other and further relief as is just and proper.

Dated: August 2, 2011                    Respectfully submitted,


                                         **COX SMITH MATTHEWS INCORPORATED**

                                         By: */s/ George H. Tarpley*
                                              Mark E. Andrews
                                              State Bar No. 01253520
                                              George H. Tarpley
                                              State Bar No. 19648000
                                              Stephen K. Lecholop II
                                              State Bar No. 24070119
                                              1201 Elm Street, Suite 3300
                                              Dallas, Texas 75270
                                              (214) 698-7800
                                              (214) 698-7899 (Fax)

                                         **PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on

_____