# EXHIBIT "B"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § | **CHAPTER 11 CASE** |
| | § | |
| **JCE DELAWARE, INC., et al.,** | § | **CASE NO. 11-11926** |
| | § | |
| Debtors. | § | **Joint Administration Request Pending** |
| | § | |

**INTERIM ORDER: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING ON AN INTERIM BASIS AND TO GRANT SENIOR LIENS, JUNIOR LIENS AND SUPER PRIORITY ADMINISTRATIVE EXPENSE STATUS; AND (II) AUTHORIZING USE OF CASH COLLATERAL FROM CONTRACTS BONDED BY LIBERTY MUTUAL INSURANCE COMPANY AND/OR SAFECO INSURANCE COMPANY AND PROVIDING ADEQUATE PROTECTION AND (III) OTHER RELIEF**

COMES NOW before the Court, J. C. Evans Construction Co. LP, J.C. Evans Construction Co., LP, J.C. Evans Construction Holdings, Inc., Chaparral Communications & Energy, LLC, American Aggregates, LLC, Adkins Land Development, L.P., the above captioned debtors and debtors-in-possession (collectively, "**J.C. Evans**" or the "**Debtors**"),[1] pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1), of Title of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of this order ("**Interim Order**") authorizing Debtors:

(a)    to use cash collateral on an interim basis received from Safeco contracts for which Safeco issued surety bonds (the "**Safeco Bonded Contracts**"), which funds shall be held by Liberty Mutual Insurance Company of America and/or Safeco Insurance Company ("**Safeco**") in a segregated account (the "**J.C. Evans Bonded Receivables Account**") under an approved interim budget with adequate protection therefore;

---

[1]    The Chapter 11 cases of each Debtor listed herein shall collectively be referred to as the "Chapter 11 Cases," and each a "Chapter 11 Case." The bankruptcy estate of each Debtor is referred to collectively as "Estates" and each an "Estate."

(b)     to obtain interim post-petition financing from Safeco in an amount up to $2,500,000 for a period not to exceed 4 weeks after the Petition Date, hereinafter defined, pursuant to an approved interim budget;

(c)     to secure the post petition DIP loan funds advanced by Safeco, to grant Safeco, pursuant to Bankruptcy Code §§ 364(c)(2) and (3) and 364(d), liens on and security interests in all of Debtors' currently owned and after acquired real and personal property to secure Debtors' obligations to Safeco as provided for herein;

(d)     to secure the post petition DIP loan funds advanced by Safeco, to grant Safeco, pursuant to Bankruptcy Code § 364(c)(1), with respect to the property and assets of the Debtor, an administrative super-priority claim as provided for herein; and

(e)     to use cash collateral upon which First State Bank of Central Texas ("**First State Bank**") claims a first priority security and to grant replacement liens, as adequate protection, to First State Bank for the diminution in value of such cash collateral in the same validity, priority and extent to which First State Bank liens possessed pre-petition;

and due and sufficient notice of this Motion having been given under Rule 4001(c) and the circumstances; and upon the entire record and arguments of counsel; and this Court having found good and sufficient cause appearing therefore:

**IT APPEARS THAT:**

1.      Pursuant to Rule 4001(c), the Debtors have provided adequate notice of the Motion and opportunity to object to the entry of this Interim Order to: (i) the United States Trustee for the Western District of Texas; (ii) all parties with asserted secured claims against the property of the estates; (iii) the Debtors' 20 Largest Unsecured Creditors; (iv) all parties

appearing in these Chapter 11 Cases and requesting notice; (v) any other parties entitled to notice under Rule 4001(b).  The foregoing notice is adequate and sufficient in light of the emergency nature of the relief requested.

2.    On August 1, 2011, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "**Petition Date**"), and from and after that date (the "Petition Date") the Debtor has managed its property and operated its business as a debtor-in-possession pursuant to the provisions of §§ 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

3.    This Court has jurisdiction over this Chapter 11 case and this motion ("**Motion**") pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion presents a core proceeding as defined in 28 U.S.C. § 157(b)(2).

4.    The description of the Debtors and their business is set forth in the Declaration of Blake Kuhlman filed herein, to which reference it made.

5.    The Debtor's principal creditors include: (a) Safeco, for claims for pre-petition payments made to or on behalf of the Debtors in connection with Safeco Bonded Contracts and for pre-petition secured loans for which it claims a security interest in all assets of the Debtors, (b) unsecured trade creditors, including creditors on contracts for which there are no surety bonds ("**Non-bonded Contracts**"), and (c) First State Bank, which claims a first priority secured interest in virtually all of the assets of the Debtor, with the exception of the Safeco Bonded Contracts.

6.    The Debtors, together with Blake A. Kuhlman and Rosemary Kuhlman (collectively, "**Indemnitors**"), executed that certain General Agreement of Indemnity for Contractors dated May 23, 2006, and that certain Agreement of Indemnity for Specific Bonds

dated October 13, 2009, (collectively, "**Indemnity Agreements**") in favor of Safeco and their affiliates upon which Safeco relied in issuing various surety bonds to or on behalf of Debtors.

7.       Thereafter, and in reliance upon the execution of the Indemnity Agreements, Safeco issued certain written bonds (the "**Bonds**") all at the request of Indemnitors.

8.       The Debtors were faced with a difficult financial situation due to overextension of Debtors' financial resources.  Debtors defaulted with reference to some or all of the Bonds, in that, among other things, Debtors failed to pay when due certain of its obligations to subcontractors and/or suppliers for labor, materials, equipment rental, supplies and other charges incurred by Debtors in performing the work on the Safeco Bonded Projects.  Moreover, Debtors were unable to meet its financial obligations as they became due.  Debtors required and requested immediate assistance from Safeco to meet Debtors' subcontractor and vendor obligations, without which Debtors would have been unable to satisfy its obligations on the Safeco Bonded Projects.

9.       During the prepetition period, Safeco agreed to make loans to the Debtors, as evidenced by (i) that Certain Memorandum of Understanding dated February 18, 2011 (the "**Memorandum of Understanding**"); (ii) that certain Demand Note dated as of February 24, 2011 by Debtors for the benefit of Safeco (the "**Safeco Note**"); and (iii) such other notes, advances or agreements as Debtors may from time to time execute (collectively, the "**Safeco Loan Documents**").  A copy of the Memorandum of Understanding, which identifies the Bonds, is attached as *Exhibit A*.

10.       Prior to the petition date, to induce Safeco to make loans provided for in the Safeco Note and as described in the Memorandum of Understanding, and to otherwise secure the Debtors' obligation under the Safeco Note and the Indemnity Agreements, Debtors agreed to

grant a security interests in the real and personal property described in the Memorandum of Understanding ("**Safeco Collateral**") to guarantee the payment and satisfaction of Debtors' obligations and to execute and deliver a security agreement, deeds of trust and other security documents (the "**Safeco Security Documents**").

11.    Prior to the Petition Date, due to Debtors inability to meet payment and payroll obligations on the Safeco Bonded Contracts, Safeco advanced in excess of $22 million under the Safeco Note to support the Debtor's operations and efforts to complete the Safeco Bonded Contracts.  A current schedule of all pre-petition advances under the Safeco Note is attached hereto as *Exhibit B*

12.    Safeco issued performance and payment bonds for the executory contracts securing the performance of the work by Debtors and the payment of parties supplying labor and materials to Debtors for the contract work and from which it is anticipated that there are receivables that may be due the Debtors ("**Safeco Bonded Receivables**").  A list of the current Bonds for which Safeco Bonded Receivables are due is set forth in *Exhibit C.*

13.    The Debtors are proposing to continue the work on the Safeco Bonded Contracts and may elect to assume the Safeco Bonded Contracts within the meaning of §365 of the Bankruptcy Code.

14.    If no objection is filed within 15 days after the entry of this Order, as further provided herein, the Debtors stipulate and agree that Safeco duly perfected its security interest in and liens on the Safeco Collateral by filing the deeds of trust and financing statements and has valid, perfected, enforceable and non-avoidable liens and security interest in the Safeco Collateral as described in the security documents.

15.     As of the Petition Date, Safeco asserts that the Debtors are in default under the terms of the Indemnity Agreements and that Safeco, in additional to its equitable right of subrogation, has a security interest and lien on the cash proceeds of the Safeco Bonded Contracts, specifically, the Safeco Bonded Receivables, which cash proceeds constitutes its cash collateral ("**Safeco Cash Collateral**") within the meaning of Bankruptcy Code §§ 361 and 363.

16.     Safeco, by virtue of its equitable right of subrogation as a surety and under applicable non-bankruptcy law, and by virtue of its standing, asserts a superior interest in the Safeco Bonded Receivables relating to the Safeco Bonded Contracts.

17.     Safeco objects to the use of Safeco Bonded Receivables from the contracts unless there are conditions placed upon the use of those funds that will provide adequate protection of the asserted interest of Safeco in the contract consideration held and to be paid for performance of the bonded contracts.

18.     First State Bank claims a security interest in virtually all assets of the Debtors ("**FSB Collateral**").  The FSB Collateral allegedly includes receivables from Non-bonded Contracts, which may constitute cash collateral ("**FSB Cash Collateral**") within the meaning of Bankruptcy Code §§ 361 and 363.

19.     In addition to the use of the Safeco Cash Collateral and the FSB Cash Collateral, an immediate need exists for Debtors to obtain funds in order to continue operations and to administer and preserve the value of the respective bankruptcy estates.  The ability of Debtors to finance its operations, to preserve and maintain the value of its assets requires the availability of working capital under the terms and conditions described in the Safeco Loan Documents and this Interim Order.  In the absence of the availability of such funds, the continued operation of

Debtors' business would not be possible, and immediate and irreparable harm to Debtors and the respective bankruptcy Estates would occur.

20.     Safeco and Debtors have reached terms by which Safeco will agree to continue limited financial support for a time period of four (4) weeks, or to and until September, 2, 2011, subject to the terms in the Memorandum of Understanding, the Safeco Loan Documents and the renewal and extension of the Safeco Note to evidence the additional sums to be advanced by Safeco, all as modified by the terms of this Interim Order (the "**DIP Financing**").

21.     Debtors have represented they are unable to sustain operations solely with the use of cash collateral or to obtain unsecured credit conditioned solely upon an allowable administrative expense claim under Bankruptcy Code § 503(b)(1).  Financing on a post-petition basis is not available without Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having a priority over any administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b), 507(b), and 546(c), and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to Bankruptcy Code §§ 364(c) and (d) as provided herein.

22.     Given the current financial condition of Debtors, Safeco is not willing to extend post-petition financial accommodations unless Debtors grant Safeco perfected liens upon assets of the Estates with the priorities set forth herein.

23.     As set forth in the Motion, approval of this DIP Financing is essential for the Debtors' continued operations and is the best financing available to the Debtors during the interim period.  The proposed DIP Financing is in the best interests of Debtors, the Estates, and creditors and constitutes good business judgment on the part of Debtors.  The DIP Financing will minimize disruption of Debtors' business as a going concern, enable Debtors to preserve and

maintain its assets, and increase the possibility of a successful reorganization. Accordingly, good cause exists for approval of the Motion and entry of this Interim Order. The terms of the DIP Financing, the granting of liens and superpriority administrative expense claim status are fair and equitable under the circumstances.

24. Safeco and Debtors have entered into arms length negotiations, have negotiated in good faith in reaching the terms set forth in this Interim Order. Any advance by Safeco under this Interim Order shall be deemed to have been extended in good faith as that term is defined in § 364(e) of the Bankruptcy Code and is entitled to the protections contained therein.

25. Sufficient and adequate notice of the hearing and the relief requested in the Motion has been given under the circumstances and in accordance with §§ 102(l); 364(c), and 364(d) and Bankruptcy Rules 2002 and 4001(c).

26. The Court finds that entry of this Interim Order, and its immediate effectiveness, is in the best interests of the Debtors, the Estates, creditors, and parties in interest because it will enable Debtors to continue to operate, enhance the prospect for the Debtors' reorganization and increase the likelihood that for those contracts the Debtors must reject or abandon, an orderly transition from those contracts will occur.

Based on the foregoing findings of fact and there appearing good and sufficient cause:

**IT IS HEREBY ORDERED THAT:**

A. <u>Motion Granted and Interim Relief</u>. The relief sought in the Motion is granted, subject to the terms set forth in this Interim Order. All objections to the Interim Order not withdrawn are overruled on their merits. This Interim Order shall take effect immediately upon entry by the Court and shall remain in effect through and including the date of a hearing for a Final Order.

B. <u>Use of Cash Collateral and Bonded Receivables Account</u>. Debtor is authorized to use post petition collections of Safeco Cash Collateral in the ordinary course of business under the terms and conditions set forth in this paragraph. Safeco shall continue to maintain a separate account which shall be known as the "J.C. Evans Bonded Receivables Account." The funds deposited into the account shall consist of all post petition collections on Safeco Bonded Receivables on contracts for which Safeco issued Bonds (extras, claims, progress payments, retained funds). Funds deposited in this account will be timely disbursed by Safeco to the Debtor pursuant to the Interim Budget attached hereto, and will be applied in the priorities set forth below:

(a) <u>First</u>, post petition funds received through each payment from a project or contract will be disbursed to satisfy post petition work, accounts payable and other direct job costs on Safeco Bonded Project[2]; and

(b) <u>Second,</u> post petition funds received will be applied to cover the ratable portion of Debtor's post petition operating, payroll and administrative expenses incurred on projects bonded by Safeco that are not direct costs covered in the First Priority, as provided in the attached Interim Budget.

C. The post petition collections of Safeco Cash Collateral will be used for the payment of any cost and expenses, set forth in the budget attached hereto as *Exhibit D* (the "**Interim Budget**"). For each of the contracts bonded by Safeco as identified in the Interim Budget, Debtors shall provide a breakdown of the cash requirements for completion of the work. To the extent the Interim Budget contemplates payment of prepetition job costs or other charges, Safeco shall use the prepetition collected funds in the Bonded Receivables Account to make such payments to the extent required under its bonding obligations or in its discretion.

---

2   "Direct job costs" refers to payments to subcontractors and suppliers and generally to the costs of labor and materials required for the prosecution of the work at the site of the project(s), and does not refer in any way to the Debtor's overhead costs and payroll. The intent of this Agreement is to assure that lien claimants and trust fund claimants are paid before any funds are released to pay other obligations.

D.    Safeco Rights in the Safeco Cash Collateral Upon Default.  In the event: (i) an obligee obtains an order lifting the automatic stay and terminating any Safeco Bonded contract or contracts with Debtors, (ii) Debtors obtain an order rejecting any Safeco Bonded contract or contracts, (iii) Debtors have failed to make the material payments as required under the terms of this Interim Order and (iv) for any Safeco Bonded contract or contracts, the Debtors are materially unable in the future to make disbursements as required under the terms of this Interim Order,  then:

(a)    Any right of Debtors to use the Safeco Cash Collateral from the Safeco Bonded Receivables for such contract is extinguished and terminated;

(b)    Safeco is authorized to use the post petition Safeco Bonded Receivables to cure any post petition defaults by Debtors under the terms of the Safeco Bonded Contracts, and with respect to the Safeco Bonded Contracts Debtors intend to reject or has rejected, any funds held in the J.C. Evans Bonded Receivables Account attributable to such contract shall be turned over to Safeco for Safeco to use in completing the unperformed or unpaid obligations under such contract or contracts; and

(c)    Safeco retains the right to seek further relief from the Court, including, but not limited to, terminating the Debtors' use of the Safeco Bonded Receivables and requesting other forms of adequate protection in the event that Debtors default in the performance of the Safeco Bonded Contracts or fail to pay parties supplying labor and materials required for the completion of the contracts.

E.    Adequate Protection for Use of Cash Collateral.  As adequate protection for (i) the use of the Safeco Cash Collateral, in addition to all equitable subrogation and other rights under applicable non-bankruptcy law, (ii) use of the FSB Cash Collateral, Safeco and First State Bank shall be granted valid, binding, enforceable and automatically perfected replacement liens on and security interest in the same types and items of Debtors' property acquired or arising post-petition in which Safeco and First State Bank held a valid, enforceable, and properly perfected lien pre-petition (the "**Replacement Liens**"), but such Replacement Lien shall only be effective to the same extent, validity, and priority as the respective lien held by Safeco and First State

Bank as of the Petition Date, and will secure the same respective obligations as are secured by the pre-petition liens, but only to the extent of any diminution in value of Safeco's or First State Bank's collateral position. Moreover, such Replacement Liens shall not attach to any cause of action, or recoveries from such cause of action, that may arise pursuant to Chapter 5 of the Bankruptcy Code.

F. <u>Other DIP Accounts</u>. As additional adequate protection, all proceeds from receivables from the quarry owned by Debtors shall be placed into a segregated Debtor-in-Possession account, but may be used to pay the post petition costs of the Debtors' operations and bankruptcy.

G. <u>Authorization of Post-Petition DIP Financing</u>. Debtors are authorized and directed to enter into and perform its obligations in accordance with the terms and conditions of the DIP Financing and the Safeco Loan Documents and to execute and deliver to Safeco such additional documents, instruments, and agreements as may be reasonably required by Safeco to implement the terms, or effectuate the purposes of this Interim Order or any Safeco Loan Document that in their judgment are in the best interests of the Debtors' estates. The use of DIP Financing for the non-bonded payables and other general administrative expenses shall be made strictly in compliance with the Interim Budget and shall be placed in a segregated Debtor-in-Possession account.

H. <u>Advances of the DIP Financing</u>. Debtors are authorized, on an interim basis, to request and receive advances ("**Advances**") from Safeco of up to $2,500,000 on the terms and conditions of the Safeco Loan Documents, as may be restated or amended. However, such funds are not trust funds and are Debtor in Possession loan proceeds pursuant to the Bankruptcy Code. Debtors are authorized and directed to use the Advances for the purposes allowed under the

approved Interim Budget and this Interim Order. Debtors' interim authority to request and receive Advances shall expire on the date of the Final Hearing to obtain DIP Financing, as defined herein, unless extended by Court order.

I.     <u>DIP Superpriority Claim</u>. In the event that Debtors fail to reimburse Safeco for any of the Advances under the DIP Financing, Safeco shall be allowed to the extent of any such unpaid obligations or losses, in accordance with Bankruptcy Code §§ 364(c)(1) and 507(b), claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 546 and shall at all times be senior to the rights of Debtors, any successor trustee to the extent permitted by law, or any other unsecured creditor in the Chapter 11 Cases or any subsequent proceeding under the Bankruptcy Code unless otherwise provided herein. No cost or expense of administration under the Bankruptcy Code §§ 105, 364(c)(1), 503(b), 507(b) or otherwise, shall be senior to, equal to or *pari passu* with, the super-priority claim allowed Safeco herein.

J.     <u>Professional Fee Carve out</u>. Notwithstanding anything else in this Order, the DIP Financing Advances shall fund a professional fee carve-out for the Debtors' professionals in the amount of $150,000 (which sum is in addition to monthly budgeted amounts for such fees) and $50,000 for a committee carve out (if a committee is appointed) and the carve outs shall not be subject or subordinate to the superpriority claim, DIP liens or any other security granted herein or otherwise held by Safeco.

K.     <u>DIP Liens.</u> In addition to the security provided in paragraph E above, and the priority granted to Safeco in paragraph I above, and as additional security for Advances under the DIP Financing, Safeco is granted the following liens:

(a)     pursuant to §364(c)(2), Safeco is hereby granted a first priority security interest in and lien against all unencumbered property of the Debtors' Estates, including, but not limited to, accounts receivables, real and personal property, and any products or proceeds therefrom;

(b)     pursuant to §364(c)(3), Safeco is hereby granted a junior security interest in and lien against all encumbered property of the Debtors' Estates, including, but not limited to, accounts receivables, real and personal property, and any products or proceeds therefrom, subject only to valid, perfected higher priority security interests which this Court may later determine; and

(c)     pursuant to section 364(d), Safeco is hereby granted a first priority lien, in *pari passu* with First State Bank, against all real property of the Debtors' Estates as to which First State Bank asserts a first priority security interest.

L.    <u>Perfection of Liens</u>.  The liens granted to Safeco pursuant to this Interim Order and the Safeco Loan Documents shall be perfected by operation of law upon the execution of this Interim Order by the Court.  Safeco shall not be required to file or record any financing statements, deeds of trust, mortgages, notice of lien or other documents in any jurisdiction, to give any notices to, to receive acknowledgments or consents from any person, or to take any other action to validate or perfect the liens granted hereunder.  This Interim Order shall be deemed sufficient and conclusive of the validity and perfection of the liens granted hereunder.  If Safeco shall, in its sole discretion, choose to file financing statements, deeds of trust, notice of lien or other documents, other otherwise confirm perfection of such liens, Safeco is authorized to effect such filings and recordations, and all such financing statements, deeds of trust, mortgages, and similar documents shall be deemed to have been filed, recorded or made on the date hereof.

M.    <u>Disposition of Collateral</u>.  Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Safeco Collateral except as otherwise provided in this Interim Order, the Safeco Loan Document or the Memorandum of Understanding unless approved by this Court, after notice and a hearing.

N.    Events of Default.  The occurrence of any of the following shall constitute an Event of Default under this Interim Order and the Safeco Loan Documents: provided that the default is not caused by Safeco and that Safeco is otherwise in compliance with this order, (a) Debtors become unable to pay all of its administrative and other reorganization expenses and claims as they become due and payable; (b) the conversion of any pending Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or the dismissal of any Chapter 11 Case under § 1112 of the Bankruptcy Code; (c) the appointment of a trustee or examiner in any Chapter 11 Case under §1104 of the Bankruptcy Code; (d) the failure to comply with any material term or condition of this Interim Order, the Safeco Loan Documents and the Memorandum of Understanding, including but not limited to, a material departure from the Interim Budget. Safeco must advise the Debtors in writing of the specific alleged default prior to declaring an Event of Default.  Three business days after receipt of such written notice by the Debtors and unless waived by Safeco in writing, and subject to any Court order, the Debtors' right and authority to use Safeco Cash Collateral and Safeco's obligation to provide any further Advances under the DIP Financing will immediately terminate.  Safeco's decision to not pursue any specific remedy at any time shall not be construed as a waiver of any such remedy or other remedies.

O.    Termination of Safeco Bonded Contracts.  In the event of a default by Debtors, or in the event that Safeco elects to terminate financial support at the end the four week period for financing contemplated in this Interim Order, Safeco shall provide notice of the default or election to terminate financial support ("**Notice**") to the Debtors and file the Notice with the Court and serve it as required by the applicable rules. If no party files an objection within five (5) days of the filing of the Notice by Safeco, the automatic stay shall terminate without further

order of the Court and Safeco can take control of all or any post petition Safeco Bonded Receivables attributable to work on the Safeco Bonded Contracts that occurred during the period in which the Debtors were allowed to use the Safeco Cash Collateral, such funds to be payable to Safeco first to repay any remaining Advances and then for Safeco to use in paying post petition bonded obligations on and completing the Safeco Bonded Contracts. With respect to any Safeco Bonded Contract, Safeco may issue, in its discretion, a letter terminating the Debtors rights to proceed with the contract; and the Debtors shall thereafter immediately file a motion to reject any such contract, which shall be heard on an expedited basis. If a party files an objection to the Notice, the objection shall be set for hearing on an expedited basis and the automatic stay shall remain in place pending further order of the Court.

P.    Bond Obligations Unaffected.  Nothing in this order shall modify or limit any obligations that Safeco has to any third party on the Bonds.

Q.    Confirmation of Validity of Safeco's Prepetition Liens.  The Debtors, as Debtors-in-possession, shall have 15 days from the entry of this Order to review the validity and perfection of the pre-petition liens of Safeco under the Safeco Loan Documents and Memorandum of Understanding.  If no objection if filed thereto by the Debtors in the 15 day review period, the Debtors are deemed to have stipulated that such liens constitute valid, perfected, enforceable and otherwise non-avoidable liens and security interests in the Safeco Collateral.  All other creditors shall have 30 days from the date of the entry of this Interim Order ("**Objection Period**") to file and serve any objection or challenge the validity in all respects of Safeco's pre-petition liens on the Safeco Collateral.  If no objection or challenge is timely filed and served upon the Debtors and Safeco within the Objection Period, Safeco's prepetition

security interests and liens in and against the Safeco Collateral will be established without further order of this Court.

R.  <u>Expenses of Safeco</u>.  As provided in the Safeco Loan Documents, Debtors shall pay all reasonable out-of-pocket post petition costs and expense, including legal fees of Safeco's counsel, incurred by Safeco in connection with these Bankruptcy Cases and the DIP Financing prior to the termination of the use of the Safeco Cash Collateral.  Payment of such fees shall not be subject to allowance by this Court and Safeco shall not be required to comply with U.S. Trustee fee guidelines.

S.  <u>Role of Safeco</u>.  In making decisions to make Advances or issue bonds under this Interim Order or to collect indebtedness and obligations of Debtors or to exercise any other rights under this Interim Order or otherwise, Safeco shall not be deemed to be in control of the operations of Debtors, nor to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of Debtors.

T.  <u>Good faith</u>.  Safeco is extending financial credit to Debtors and the liens, priorities and rights granted under this Interim Order are subject to the protection of Bankruptcy Code Section 364(e).

U.  <u>Documentation</u>.  Debtors shall give Safeco and First State Bank reasonable access to examine and copy the Debtors' books and records, including, without limitation, accounts receivable aging reports, accounts payable aging reports, general ledger, and the maintenance records of any equipment, Safeco Collateral or FSB Collateral.  Safeco shall account to the Debtors for all post petition collections and disbursements from the Bonded Receivables Account.

V. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of an order (i) confirming any chapter 11 plan in the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (iii) to the extent authorized buy applicable law, dismissing any of the Chapter 11 Cases.

W. <u>Inconsistency</u>. In the event of any inconsistency between the terms and conditions of the Safeco Loan Documents, the Memorandum of Understanding and this Interim Order, the provisions of this Interim Order shall control.

X. <u>Waiver of Any Applicable Stay</u>. The stay under Rule 6004(h) is hereby waived and this Interim Order shall be effective immediately upon entry.

Y. <u>Final Hearing</u>. The final hearing to consider entry of the Final DIP Financing Order is scheduled for _____, 2001 at ___ o'clock __.m. in this Court. Debtors are responsible for notice.

# # #

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("Agreement") is executed this 18th day of February, 2011 ("Effective date") by and between SAFECO INSURANCE COMPANIES and/or LIBERTY MUTUAL INSURANCE COMPANY or any of their subsidiaries (hereinafter collectively referred to as "SURETY"); J.C. EVANS CONSTRUCTION CO., LP (hereinafter collectively referred to as "CONTRACTOR"); and J.C. EVANS CONSTRUCTION HOLDINGS, INC., CHAPARRAL COMMUNICATIONS & ENERGY, LLC, AMERICAN AGGREGATES, LLC, ADKINS LAND DEVELOPMENT, L.P., BLAKE A. KUHLMAN, and ROSEMARY KUHLMAN (hereinafter collectively referred to as "INDEMNITORS", which includes CONTRACTOR), and reflects the understanding, agreement and intent of the parties regarding the subject matter discussed herein.

A. SURETY is surety on those certain written bonds more particularly identified in Exhibit "A", attached hereto and incorporated herein by reference. The bonds in Exhibit "A" identify the contracts or projects for which they were issued, all at the request of INDEMNITORS. All bonds ever executed by SURETY wherein CONTRACTOR, is the principal are referred to herein as the "Bonds." All projects covered by said Bonds are referred to herein as the "Projects."

B. As partial consideration for the issuance of the Bonds, INDEMNITORS executed and delivered to SURETY that certain General Agreement of Indemnity for Contractors dated May 23, 2006, and that certain Agreement of Indemnity for Specific Bonds dated October 13, 2009 ("Indemnity Agreements"), true and correct copies of which are attached hereto as Exhibit "B" and Exhibit "C", and incorporated herein by reference. Pursuant to the Indemnity Agreements, INDEMNITORS agreed to, *inter alia*, indemnify and hold harmless SURETY from any loss, costs, expenses, and attorney fees incurred as a result of issuing Bonds to the CONTRACTOR or INDEMNITORS, or any of them.

C. Prior to the Effective Date, CONTRACTOR has been placed into a difficult financial situation due to overextension of CONTRACTOR'S financial resources. Accordingly, CONTRACTOR is in default with reference to some or all of said Bonds, in that, among other things CONTRACTOR has failed to pay when due certain of its obligations to subcontractors and/or suppliers for labor, materials, equipment rental, supplies and other charges incurred by CONTRACTOR in performing the work on the Projects. Moreover, CONTRACTOR is presently unable to meet its financial obligations as they become due. Currently, CONTRACTOR requires immediate assistance from SURETY to meet CONTRACTOR'S subcontractor and vendor obligations, without which CONTRACTOR represents it will be unable to satisfy its obligations on the Projects.

D. The parties hereto believe that it is in their mutual best interest to have SURETY assist CONTRACTOR with these certain and limited payment

obligations at SURETY's sole and exclusive discretion. The parties desire to reach an agreement as to SURETY's satisfaction of these certain and limited payment obligations, the liability of INDEMNITORS to SURETY as a result thereof, and the manner in which INDEMNITORS will fully and completely satisfy their obligations to SURETY.

E.  All sums paid on the account of CONTRACTOR under this Agreement or otherwise, less any amounts received by SURETY on account of money due, or to become due to the Projects, shall conclusively be deemed a loss covered under the Indemnity Agreements.

F.  Terms:

1.  INDEMNITORS reaffirm their obligations under the Indemnity Agreements, including but not limited to their promise to indemnify and hold harmless SURETY in accordance with the terms and conditions of the Indemnity Agreements.

2.  Concurrently herewith, as partial consideration for SURETY's funding of certain and limited payment obligations as discussed above, INDEMNITORS hereby grant to SURETY a security interest and lien in the property more fully described below (the "Collateral"), including, but not limited to, any and all monies loaned and/or advanced by SURETY to CONTRACTOR. INDEMNITORS shall execute a sufficient number of financing statements under the Uniform Commercial Code (UCC Form 1) and/or, with respect to real property, Deeds of Trust (substantially in the form attached hereto as Exhibit "D") in order for SURETY to perfect its security interests and liens in the Collateral. INDEMNITORS agree to execute such other and further instruments or documents reasonably required or deemed necessary by SURETY to confirm, perfect, or otherwise establish the liens, security interests, and rights granted in the Collateral to SURETY pursuant to this Agreement. INDEMNITORS will also use their best efforts to obtain consents from their lenders to grant SURETY a lien in the Collateral, if required. Further, to the extent a related, subsidiary, or sister company, or an individual who is not one of INDEMNITORS, has an interest in the Collateral, INDEMNITORS will use their best efforts to cause such entities and/or individuals to execute the documents necessary to perfect a lien in the Collateral; or, if such related entities or individuals or any of INDEMNITORS have an existing security interest in any of the Collateral, INDEMNITORS will use best efforts to have such entities or individuals subordinate such secured interest to that of the SURETY.

The Collateral:

a.  Trust Deed on 10.730 acres of land, more or less, out of the ELIJAH D HARMON SURVEY, ABSTRACT NO. 6 in Williamson County, Texas, and being more fully described by metes and bounds on Exhibit "E" attached hereto and made part hereof.

b.  Trust Deed on 18.024 acres of land, more or less, out of the ELIJAH D HARMON SURVEY ABSTRACT NO. 6 in Williamson County, Texas, and being more fully described by metes and bounds on Exhibit "F" attached hereto and made part hereof.

c.  Trust Deed on 29.939 acres of land, more or less, out of the E.D. HARMON SURVEY, Abstract No. 6, in Williamson County, Texas, more fully described in Exhibit "G" attached hereto.

d.  Trust Deed on 414.78 acres of land, more or less, out of the Burrell Eaves Survey, Abstract No. 216, in Williamson County, Texas more particularly described in Deed of Trust recorded under Document No. 2005068040 of the Official Public Records of Williamson County, Texas.

e.  Trust Deed on 4.988 acres in Williamson County, Texas more particularly described in Deed of Trust recorded under Document No. 2006002993, of the Official Public Records of Williamson County, Texas.

f.  Trust Deed on 86.237 acres in Williamson County, Texas more particularly described in Deed of Trust recorded under Document No. 2007029478, of the Official Public Records of Williamson County, Texas.

g.  Trust Deed on 75.00 acres of land, more or less, out of the LEMUEL HOPKINS SURVEY, Abstract No. 293, in Williamson County, Texas, and being more fully described by metes and bounds in Exhibit "H" attached hereto.

h.  Trust Deed on 5.0 acres of land, more or less out of the BURRELL EAVES SURVEY, Abstract No. 216, in Williamson County, Texas and being more fully described by metes and bounds in Exhibit "I" attached hereto.

i.  Trust Deed on 1.0 acre of land, more or less out of the BURRELL EAVES SURVEY, Abstract No. 216, in Williamson County, Texas and being more fully described by metes and bounds in Exhibit "J" attached hereto.

j.  A lien/Trust Deed on that certain 100 acre option tract described in the sales contract attached hereto as Exhibit "K".

k.  A lien on all of INDEMNITORS' right, title and interest in and to certain policies of insurance owned by INDEMNITORS, issued by Pacific Life Insurance Company (the "Insurer"), under Master Policy #VP6JCEVANS. Employee Policies VP62385220 through VP62385940, and having coverage amounts as shown therein (collectively the "Policy"), including but not necessarily limited to, the proceeds of death benefits under the Policy, the cash surrender value of the Policy, and other incidents of ownership of the Policy; all property acquired in substitution of replacement of the foregoing; all proceeds of the foregoing; all accounts, accounts receivable, contract rights, rights, revenues, incomes, benefits, general intangibles, money, instruments, documents, files, computerized or other records, books, ledger sheets, rights to payment, contract rights and the like appertaining to, generated from, arising out of, or belonging to the Collateral, and all proceeds thereof; all rights to any cash value in the Policy; and all rights to any loan provisions in the Policy.

l.  A lien on all accounts receivable from services performed by INDEMNITORS on unbonded contracts or maintenance contracts.

m.  A lien on all of the right, title and interest of INDEMNITORS in, to and under leases, together with all rents, earnings, income, profits, benefits and advantages arising from the real property described herein above and/or from said leases and all other sums due or to become due under and pursuant thereto and together with any and all guarantees of or under any of said leases, and together with all rights, powers, privileges, options and other benefits of INDEMNITORS as lessor under the leases, including without limitation the immediate and continuing right to receive and collect all rents, income, revenues, issues, profits, condemnation awards, insurance proceeds, moneys and security payable or receivable under the leases or pursuant to any of the provisions thereof whether as rent or otherwise,

the right to accept or reject any offer made by any tenant pursuant to its lease to purchase the real property described hereinabove and any other property subject to the lease as therein provided and to perform all other necessary or appropriate acts with respect to such purchases as agent and attorney-in-fact for INDEMNITORS, and the right to make all waivers and agreements, to give and receive all notices, consents and releases, to take such action upon the happening of a default under any lease, including the commencement, conduct and consummation of proceedings at law or in equity as shall be permitted under any provision of any lease or by any law, and to do any and all other things whatsoever which INDEMNITORS is or may become entitled to do under any such lease.

n.    A lien on all goods, equipment, machinery, rolling stock, trucks, automobiles, trailers, furnishings, furniture, appliances, accessories, leasehold improvements, chattels, tools, parts, inventory of any kind (including all minerals, rocks, limestone and other mineable material quarried or in place), signs, displays, fixtures, floor coverings, keys, telephone numbers, and other items of personal property owned by INDEMNITORS including but not limited to the items shown in Exhibit "L" attached hereto and made a part hereof, as well as any other equipment not listed in Exhibit "L" in which any of INDEMNITORS have an interest, including, but not limited to, all surveying equipment.

o.    A lien on all accounts receivable, contracts receivable, and all other rights, revenues, income, issues, benefits, contract rights, chattel paper, money, instruments, executory contract rights, and rights as an unpaid vendor for payment for work, services, maintenance or goods on unbonded or bonded contracts; all equipment of any nature; all inventory of any nature; general intangibles; fixtures and trade fixtures; and all oil, gas and other mineral interests and rights, all whether now existing or hereafter arising, and all proceeds, products, accessions and accessories thereof.

p.    A lien on all trade names, trademarks, copyrights, franchises, franchise rights, licenses, general intangibles, and permits owned by, held by or accruing to the benefit of INDEMNITORS.

q.    A lien on all accessions, accessories and appurtenances to any of the Collateral.

r.    A lien on all improvements, extensions, alterations, substitutions, replacements, renewals, and rights belonging or in any way appertaining to all or any part of the Collateral or acquired for use in connection therewith.

s.    A lien on all right, title, and interest of INDEMNITORS to and under all leases or agreements now existing or hereafter entered into for the use, occupancy, or sale of the whole or any part of the Collateral.

t.    A lien on all proceeds payable or to be payable under each policy of insurance relating to the whole or any of the Collateral.

u.    A lien on all proceeds arising from the taking, conveyance, or sale of all or any of the Collateral (or any interest therein or right accruing thereto) as a result of (or in lieu or anticipation of) any public or quasi-public use under any law or the exercise of the right of appropriation, confiscation, condemnation, or eminent domain.

v.    A lien on (without limiting any other description of the Collateral) all rights, rents, revenues, income, issues, benefits, leases, contract rights, general intangibles, chattel paper, money, instruments, documents, files, computerized or other records, books, ledger sheets, executory contract rights, rights as an unpaid vendor (including the rights to stop goods in transit, to replevy, and to reclaim), tenements, hereditaments, and appurtenances now or hereafter owned by INDEMNITORS and appertaining to, generated from, arising out of, or belonging to any of the Collateral, and all products and proceeds thereof.

3.    INDMENITORS warrant and represent that the list of collateral set forth hereinabove includes all real property owned by INDEMNITORS or in which INDEMNITORS have an interest (not including homesteads) and all other substantial assets, whether encumbered or not. Should it be determined that there is additional collateral available to INDEMNITORS not set forth hereinabove, INDEMNITORS will promptly execute and provide to SURETY, a sufficient number of financing statements under the Uniform Commercial Code and/or deeds of trust as done with the Collateral set forth hereinabove.

4. In exchange for the Trust Deeds and other liens created herein, and the terms and conditions of this Agreement, SURETY will deliver up to the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) ("Surety Loss") by ACH or check to an account of SURETY'S sole discretion and choice to assist CONTRACTOR in payment of subcontractors, suppliers, and direct CONTRACTOR labor, or any general and administrative expenses as SURETY may approve, and/or for any other purposes SURETY, in its sole discretion, may deem appropriate. INDEMNITORS acknowledge and agree that the amounts delivered by Surety address in this paragraph will not become advances to or for the benefit of CONTRACTOR until such time as Surety transfers, at its sole discretion, whether to CONTRACTOR or to subcontractors, suppliers, or others, for such purposes SURETY may deem appropriate relating to the bonded projects.

5. In further consideration of the agreements herein, CONTRACTOR, with the agreement of INDEMNITORS, shall execute Letters of Direction addressed to the obligees on the Projects, a sample copy of which is attached hereto as Exhibit "M", directing that all contract funds on the bonded Projects be made payable to SURETY, and mailed to SURETY to the attention of Kenneth Rockenbach, 1600 N. Collins Blvd., Suite 3000, Richardson, Texas 75080-3519. INDEMNITORS agree that any contract funds that INDEMNITORS receive contrary to the Letters of Direction shall be held as trust funds by INDEMNITORS and shall be immediately presented to SURETY.

6. In further consideration of the agreements herein, and with the consent and approval of INDEMNITORS, CONTRACTOR shall execute voluntary letters of default and termination (the "Letters of Default") addressed to the obligees for each of the Contracts and Projects, a sample copy of which is attached hereto as Exhibit "N". In accordance with the terms of the Indemnity Agreements and this Agreement, SURETY may use the Letters of Default on each Contract and Project, individually as to each separate Contract or to all of the Contracts, in the sole option and discretion of SURETY.

7. INDEMNITORS shall, jointly and severally, repay the entire Surety Loss upon receiving a demand from SURETY.

G. INDEMNITORS hereby irrevocably confirm, set over, and assign to SURETY, to the extent not already done, all right, title, interest, claims, and causes of action, from any source or for any reason that CONTRACTOR and/or INDEMNITORS, or any of them, had or have, arising in any way from or out of any of the Bonds and/or Projects, including but not limited to, all Project contract funds, Project progress

payments, earned or unearned Project contract balances, Project change orders, Project extras, Project Subguard claims, Project subcontractor or other bond claims, and any and all claims of any nature, whether such funds are due now or are to become due in the future.

SURETY shall be entitled to use all Project contract balances and retainage from and or all of the Bonded Projects to reimburse itself for the payments made under this Agreement and otherwise. The parties recognize and agree that all sums paid by SURETY to resolve claims on said Bonds shall give rise to SURETY's equitable rights of subrogation to all Project contract proceeds on contracts covered by said Bonds. Nothing in this Agreement is intended to waive, release or modify SURETY's equitable subrogation rights or its rights pursuant to the Indemnity Agreements. This clause is complementary and not intended to be in derogation of any existing or future rights of SURETY.

H.    Nothing contained in this Agreement shall be construed to be a substitution of or derogation of any of SURETY's common law or statutory rights as surety, and SURETY's rights hereunder shall be in addition to SURETY's rights under contract, law and equity.

I.    **Nothing contained in this Agreement shall be construed as a promise by SURETY to issue bonds to CONTRACTOR or any of INDEMNITORS in the future.**

J.    INDEMNITORS hereby acknowledge and agree that SURETY has no obligation to provide financial assistance to CONTRACTOR in any manner or method, or to make any payments other than those payments which SURETY has specifically agreed to make, pursuant to the terms of this Agreement or said Bonds. INDEMNITORS specifically acknowledge and agree that their execution of this Agreement has not been induced by or made in reliance upon any oral or written representations by SURETY or its agents, employees, attorneys or consultants that SURETY will provide any financial assistance to any of INDEMNITORS.

K.    The parties understand and agree that as a condition precedent to further and additional performance by SURETY, beyond that which is set forth in this Agreement, *if at all*, SURETY will require a full and complete loan agreement and related documents to be specified by SURETY executed by INDEMNITORS, and each of them. INDEMNITORS agree to take all reasonable measures, including providing necessary information and timely responses, so as to allow for the formation and execution of the necessary loan agreement and related documents. The parties understand that this Agreement is meant to address current and immediate needs, and is not a substitute for the loan agreement discussed herein. Neither this paragraph nor any other provision of this Agreement

obligates SURETY to provide any financial or other assistance other than as specifically provided under Paragraph F4.

L.    It is expressly agreed that this Agreement is intended to be solely for the benefit of the parties hereto and shall not create a right or benefit in favor of any person not a party hereto or in any way increase the rights of third persons or increase the obligations of any party hereto to any such third persons.

M.    This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the Effective Date.

**J.C. EVANS CONSTRUCTION CO., LP**

By: _~Blake Kuhlman signature~_
Print Name: _BLAKE A KUHLMAN_
Title: _PRESIDENT_

**J.C. EVANS CONSTRUCTION HOLDINGS, INC.**

By: _~Blake Kuhlman signature~_
Print Name: _BLAKE A. KUHLMAN_
Title: _PRESIDENT_

**AMERICAN AGGREGATES, LLC**

By: _~Blake Kuhlman signature~_
Print Name: _BLAKE A. KUHLMAN_
Title: _PRESIDENT_

**CHAPARRAL COMMUNICATIONS & ENERGY, LLC**

By: _~Blake Kuhlman signature~_
Print Name: _BLAKE A. KUHLMAN_
Title: _VICE PRESIDENT_

**ADKINS LAND DEVELOPMENT, L.P.**

By: _~Blake Kuhlman signature~_
Print Name: _BLAKE A. KUHLMAN_
Title: _MANAGER_

_~Blake Kuhlman signature~_
**BLAKE A. KUHLMAN**

_~Rosemary Kuhlman signature~_
**ROSEMARY KUHLMAN**

**LIBERTY MUTUAL INSURANCE COMPANY**

By: _~signature~_
Print Name: _KENNETH W. ROCKENBACH_
Title: _HOME OFFICE COUNSEL_