IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § § | CHAPTER 11 CASE |
| JCE DELAWARE, INC., et al., | § § | CASE NO. 11-11926 |
| Debtors. | § § § | Jointly Administered |

**MOTION FOR ENTRY OF ORDER (A) APPROVING THE PROCEDURES FOR
SOLICITING OFFERS FOR THE DEBTOR'S QUARRY ASSETS;
(B) SCHEDULING A CONTINGENT HEARING TO APPROVE A STALKING
HORSE BIDDER AND ANY BID PROTECTIONS; (C) APPROVING
PROCEDURES TO SET CURE AMOUNTS ON CONTRACTS AND LEASES
RELATED TO THE QUARRY ASSETS (D) AUTHORIZING AN AUCTION OF
THE QUARRY ASSETS; AND (E) GRANTING RELATED RELIEF**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

JCE Delaware, Inc., JC Evans Construction Holdings, Inc., JC Evans Nevada, LLC, Equus Development, Inc., JC Evans Construction Co. LP, and Adkins Land Development, LP (collectively, the "Debtors"), the debtors and debtors-in-possession in the above captioned chapter 11 cases (the "Cases"), hereby file this *Motion for Entry of Order (A) Approving the Procedures for Soliciting Offers for Certain of the Debtor's Quarry Assets; (B) Scheduling a Contingent Hearing to Approve a Stalking Horse Bidder and any Bid Protections; (C) Approving Procedures to Set Cure Amounts on Contracts and Leases Related to the Quarry Assets; (D) Authorizing the Debtor to Conduct an Auction of the Quarry Assets; and (E) Granting Related Relief* (the "Motion"). In support of this Motion, the Debtors respectfully represent the following:

# I.
# JURISDICTION, VENUE, AND BACKGROUND

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 157 and 1334. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. A creditors' committee has been appointed by the United States Trustee. Neither a trustee nor an examiner has been requested or appointed in the Cases. A motion requesting the joint administration of the Debtors' estates has been granted.

3. A description of the background of the Debtors and the events leading up to the filing of the voluntary petitions by the Debtors is provided in the *Declaration of Blake Kuhlman in Support of First Day Motions* [Docket No. 3] (the "Kuhlman Declaration"), which is incorporated herein by reference.

4. The statutory predicates for the relief requested herein are sections 105, 363, 365, 503, 507, and 1129 of the Bankruptcy Code, and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Such relief requested is also consistent with the Local Court Rules of Bankruptcy Court for the Western District of Texas (the "Local Rules"), including the *Guidelines for Early Disposition of Assets in Chapter 11 Cases*, attached as Exhibit I to the Appendices to the Local Rules.

# II.
# PRELIMINARY STATEMENT

5. Through this Motion, the Debtors ask to establish a process through which they may sell a significant asset—i.e., a 700 acre quarry, and certain heavy equipment and stone inventory related thereto, and to assign contracts and leases related to the quarry operations

2

(collectively the "Quarry Assets"), pursuant to sections 363(b) and (f), and 365 of the Bankruptcy Code, free and clear of liens, claims, and encumbrances. The Debtors propose to conduct the overall auction and sale process on the following schedule:

    (a)    **September 30**:    Deadline to receive stalking horse bids.

    (b)    **October 7**:    Deadline for Debtors to designate any acceptable stalking horse bid, and to file notice of proposed cure amounts for any contracts or leases relevant to the sale.

    (c)    **October 13**:    Proposed Hearing Date to approve stalking horse bid, if any, and related bid protections.

    (d)    **October 27**:    Deadline for objections to the Debtors' proposed cure amounts.

    (e)    **November 3**:    Deadline for submission of Offers to purchase the Quarry Assets. Deadline for any party desiring to make a credit bid to have obtained a court order authorizing the credit bid and amount.

    (f)    **November 10**:    Auction, to be held at the Cox Smith Matthews' offices in San Antonio.

    (g)    **November 17**:    Proposed hearing date to approve the sale of the Quarry Assets, approve the cure amounts, and assume and assign relevant contracts and leases (Sale Hearing).

    (h)    **December 16**:    Proposed closing date for sale.

6.    As detailed in the Kuhlman Declaration, one of the Debtors' most valuable assets is a 700 acre quarry located near Leander, Texas. The Debtors believe that the sale of the Quarry Assets will provide a significant return to the estate and materially assist the Debtors to emerge from bankruptcy. To ensure maximum exposure of the Quarry Assets to potential buyers and investors within a time period that will ensure the Debtors' ability to effectively reorganize, the Debtors file this Motion and seek to establish the procedures described more fully below.

# III.
# RELIEF REQUESTED

7. By this Motion, the Debtors request, *inter alia*, the entry of an order (the "Bid Procedures Order") approving the following procedures for obtaining offers for the Quarry Assets.

    (a) **Data Room**: The Debtors, through their professionals, shall establish a data room (whether physical or virtual) containing due diligence materials reviewable by Potential Buyers (as defined below). To obtain access to the Debtors' due diligence materials, an interested party must execute a confidentiality agreement in a form acceptable to the Debtors, and (ii) produce financial statements or other documents that demonstrate, to the Debtors' satisfaction, that such interested party is financially capable of closing on a purchase within a time period acceptable to the Debtors. Upon satisfaction of the foregoing requirements, the interested party will be considered a "Potential Buyer." Notwithstanding the data provided by the Debtors, each interested party is solely responsible for conducting its own due diligence and for verifying the accuracy of the information provided by the Debtors.

    (b) **Confidentiality Agreement/Due Diligence Materials/Asset Purchase Agreement**: Parties may obtain a confidentiality agreement, access the data room and obtain a copy of the Debtors' proposed Asset Purchase Agreement by contacting the Debtors' financial advisor in charge of the sale process, Jay Linde at Burnham Securities, Inc., phone 212-333-9606, email jlinde@bsibam.com.

    (c) **Conditions of Sale**: The Quarry Assets shall be sold "**AS IS and WHERE IS**", without any representations or warranties by the Debtors or the bankruptcy estates other than as set for expressly in the Asset Purchase Agreement.

    (d) **Stalking Horse Procedures**: If a Potential Buyer seeks to be a stalking horse bidder by submitting a proposed agreement to enter into a purchase (whether or not it includes bid protections or fee reimbursement terms) such stalking horse offer must be received by no later than 5:00 p.m.[1] on September 30, 2011 (the "Stalking Horse Bid Deadline"). The Debtors, in consultation with their professionals, will decide whether to accept the proposal as a stalking horse offer. If the Debtors determine, in exercising their business judgment and after consulting with their professionals, that a stalking horse offer should be accepted, subject to receipt of a higher and better offer, then no later than 5:00 p.m. on October 7, 2011, the Debtors will file a Notice of Stalking Horse Offer. The Debtors request, by this Motion, that the Court schedule a hearing on October 13, 2011, if necessary, to consider the Stalking Horse Offer and authorize the Debtors to accept the Stalking Horse Offer, or any enhanced Stalking Horse Offer proposed prior to the hearing

---

[1] Unless otherwise provided herein, all time shall be Central Standard Time.

3563453.3

in a form and substance acceptable to the Debtors and which is deemed by them to be a superior offer.

(e) **Cure Amounts on Quarry related Contracts/Leases**: On or before October 7, 2011, the Debtors will file with the Court and serve on relevant lease/contract counterparties a notice of the cure amounts, if any, that the Debtors believe are payable if the contract or lease is assumed and assigned to the purchaser as part of the sale.

(f) **Objections to Cure Amount**: Any party who disagrees with the Debtors' proposed cure amount shall file an objection thereto on or before October 27, 2011, indicating the basis of the objection as well as the monetary amount of and calculation supporting the cure payment it believes would be due as part of the assumption and assignment as of the time of the sale

(g) **Delivery of Offers**: Proposed Stalking Horse Offers and any Offers by other parties must be delivered such that they are received by the due date to:

> (i) Debtors' Counsel: Mark Andrews and George Tarpley, Cox Smith Matthews, Incorporated, 1201 Elm, Suite 3300, Dallas, TX 75270. Email: mandrews@coxsmith.com and gtarpley@coxsmith.com
>
> (ii) Debtors' financial advisors: Jay Linde, Burnham Securities, Inc., 1325 Avenue of the Americas, 26th Floor, New York, NY 10019. Email: jlinde@bsibam.com
>
> (iii) Committee Counsel: John Melko, Gardere Wynne Sewell, LLP, 1000 Louisiana, Suite 3400, Houston, TX 77002-5011. Email: jmelko@gardere.com
>
> (iv) Surety Counsel: Christopher Ward, Strasburger & Price, LLP, 901 Main Street, Suite 4400, Dallas, TX 75202-3794. Email: christopher.ward@strasburger.com
>
> (v) First State Bank Counsel: Blake Rasner, Haley & Olson, PC, 510 N. Valley Mills Dr., Waco, TX 76710. Email: brasner@haleyolson.com

(h) **Bid Deadline**: Any Potential Buyer may submit to the Debtors a proposed agreement to enter into a purchase (an "Offer") any time before 5:00 p.m. on November 3, 2011 (the "Bid Deadline").

(i) **Bid Requirements**: Each Offer and Stalking Horse Offer must:

> (vi) state, in a clear and concise manner, the identity of the purchaser and affiliates and owners, and identify the specific assets to be acquired and the consideration to be given by the Potential Buyer to

5

(vii)   the Debtors, and be accompanied by a signed Asset Purchase Agreement;

(vii)   be accompanied by a redline of the Debtors' proposed Asset Purchase Agreement showing all changes proposed thereto;

(viii)   contain no contingencies to obtain financing or conduct additional due diligence after the Bid Deadline;

(ix)   contain no conditions precedent to closing requiring the receipt of any third party approval (other than the Bankruptcy Court or any governmental or regulatory agency), and commit to a closing no later than December 16, 2011, unless otherwise agreed with the Debtors;

(x)   not be conditioned upon the approval by the Bankruptcy Court, or receipt by the Potential Buyer, of any bid protections or break-up fees except to the extent such protections or fees are approved as part of an accepted Stalking Horse Offer;

(xi)   provide that the Offer is irrevocable for fourteen (14) days after the entry of an order approving a purchase of the Quarry Assets. acknowledge that the Potential Buyer has: (x) had the opportunity to conduct its own due diligence and independent review of the Debtors' Quarry Assets and financial information; and (y) relied solely upon its own due diligence, and not any oral or written statements of the Debtors, their professionals, or any other third party;

(xii)   be accompanied by: (x) an executed escrow agreement that is acceptable to the Debtors; (y) proof of receipt by an escrow agent of the Potential Buyer's deposit in an amount of no less than $1,000,000 (the "Good Faith Deposit"). The Good Faith Deposit of the successful purchaser shall be applied to the purchase price at Closing. The Good Faith Deposit of the Back-up Bidder shall be returned to it within five business days of the Closing, and the Good Faith Deposits of all other Qualified Bidders shall be returned to them within five business days of the announcement by the Debtors of the Successful Bid and Back-up Bid; and

(xiii)   be received by the Debtors no later than the Bid Deadline, except that any Stalking Horse Offer must be received by the time set forth above for considering such offers.

(xiv)   if there is an approved Stalking Horse Offer any other Offer must be in an amount that exceeds the Stalking Horse Offer by the cost to the Debtors of any bid protections contained therein plus $250,000.

6

(xv) commit that if such Offer is determined to be the Back-up Bid, that such Offer shall remain open until the Successful Bid is closed, and may be substituted for the Successful Bid if the Debtors determine that the Successful Bid cannot successfully or timely be closed.

(xvi) identify each executory contract or lease that the bidder anticipates assuming as part of its purchase, and committing to pay at closing the applicable cure amount, if any, attributable to such contract or lease.

(xvii) be an all cash proposal unless the Offer is intended to contain a credit bid component. In such case the bidder must indicate in the Offer the basis for and amount of (including a calculation supporting) the credit bid component. Any party that believes it is entitled to make a credit bid must obtain court approval for the credit bid and amount thereof on or before November 3, 2011. Any bid containing a credit component that has not been authorized by court order by November 3 is subject to be being rejected by the Debtors and the bidder not allowed to participate in the Auction. The Good Faith Deposit must be posted in cash regardless of whether a party believes it is entitled to credit bid.

(xviii) All Potential Bidders making Offers complying with the requirements (i) through (xvii) above (to the extent such requirements are not waived or modified by the Debtors in their discretion) shall be Qualified Bidders entitled to participate in the Auction. The Debtors shall have the discretion in their judgment to determine whether a party should be deemed a Qualified Bidder and whether any purchase proposal shall be deemed an Offer.

(j) **Determination of Initial Highest Bid**: Based on the Offers received prior to the Bid Deadline, the Debtors will determine, in consultation with its professionals the highest and best Offer received (the "Initial Highest Bid"), taking into consideration the best interests of the estate and its creditors. No later than 5:00 p.m. on November 7, 2011, the Debtors will give written notice to all Qualified Bidders: (a) that they are invited to the Auction (defined below); and (b) the amount of the Initial Highest Offer and a copy of such offer.

(k) **Auction**: The Debtors will conduct an auction of the Quarry Assets (the "Auction") on November 10, 2011, at 10:00 a.m. in the offices of Cox Smith Matthews Incorporated, 112 East Pecan Street, Suite 1800, San Antonio, Texas 78205, or at such alternative time and location as the Debtors shall advise or as set by the Court. The parties to be admitted to the Auction shall be representatives of the following parties: (i) the Debtors; (ii) any official committee; (iii) First State Bank Central Texas and Liberty Mutual Insurance Company/Safeco; (iv) if applicable, the Stalking Horse Bidder; (v) the Qualified Bidders; (vi) the United States Trustee, and (vii) any other party invited by the Debtors (collectively, the "Auction Participants"). Each bidder must have a

7

representative present during the Auction with authority to bind the bidder, and such authority must be confirmed on the record prior to the beginning of the Auction. During the Auction, the Debtors will accept bids from the Qualified Bidders and the Stalking Horse Bidder. The bidding shall start at the Initial Highest Offer. The next subsequent bid, if any, shall be in an amount sufficient to pay any bid protections contained in the Initial Highest Offer plus $250,000. Thereafter bids shall be increased in minimum increments of $250,000, or such other amount as determined by the Debtors in consultation with their professionals, until no additional offers are submitted by a Qualified Bidder. While it is the intention of the Debtors to sell the Quarry Assets as a single unit, if the nature and substance of the Offers suggest to the Debtors that it would be in the best interests of the estate and creditors to sell the Quarry Assets in lots, the Debtors may modify the Auction accordingly. At the Auction, the Debtors may announce such rules and procedures as they deem necessary for the conduct of a successful and timely auction, including rules on time intervals between bids, modification of minimum bid increments, etc. The Auction will be transcribed. Upon the conclusion of the bidding, the Debtors will consider the bid amount, conditions, contingencies, and terms submitted by each Qualified Bidder, and after consulting with its professionals, and in the Debtors' exclusive business judgment, determine which bid presents the highest and best consideration and recovery for the Debtors' estates, their creditors, and their stakeholders. Upon reaching such a determination, the Debtors will announce (i) the highest and best offer (the "Successful Bidder"); and (ii) the second highest and best offer (the "Back-up Bidder"). If a Stalking Horse Bidder has been approved, any offer submitted by a Bidding Party other than the Stalking Horse Bidder will be reduced by the Break-up Fees (such that the net amount received by the Debtors, after deducting the amounts necessary to pay the Break-up Fees, remains the highest and best offer).[2]

(l) **Reservation of Rights**: Except to the extent these Bid Procedures (if approved by the Court) set deadlines for certain actions, nothing in these Bid Procedures shall waive any rights of any party to object to the Debtors' selection of the Successful Bidder and Back-up Bidder, or any other objection to the Sale.

(m) **Sale Hearing**: The Debtors will then ask the Court to approve the Successful Bidder and the Back-up Bidder during a hearing on November 17, 2011 (or such other time as set by the Court, the "Sale Hearing"). At the hearing, the Debtors will also ask the Court to approve the proposed Cure Amounts for any contract or lease to be assumed by the purchaser. The Debtors will separately file a Motion to Sell, which shall be heard on November 17, 2011.

(n) **Closing of Sale**: Closing of the approved sale shall be on December 16, 2011 ("Closing"), unless otherwise agreed to by the Debtors and the Successful Bidder.

---

[2] The Debtors reserve the right to adopt such other rules for the Auction as necessary to promote the goals of obtaining the highest and best offer for the estate, its creditors and stakeholders, and at any time before the Sale Hearing, may impose such other terms and conditions as they determine is in the best interests of the estate and its creditors.

(o) **Forfeiture of Deposit**: If the Successful Bidder (or if relevant the Backup Bidder if it becomes the Successful Bidder) fails timely to close and fund the purchase because of a failure to perform or breach by such bidder, its Good Faith Deposit shall be forfeited as part (but not a lim**itation on) the** Debtors' damages for such failure or breach.

(p) **Backup Bidder**: If the Successful Bidder fails timely to close and fund its approved purchase or otherwise defaults on the purchase, the Debtors shall so notify the Successful Bidder and the Court, and may (but shall not be required) to close the sale with the Backup Bidder.

## IV.
## ARGUMENTS AND AUTHORITY

A. **Auctions in General**

8. The relief requested by this Motion is appropriate pursuant to the Court's equitable powers under section 105(a) of the Bankruptcy Code and authority to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code, together with the authority to allow assumption and assignment of executor contracts and leases under section 365 of the Bankruptcy Code. Section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Fifth Circuit has acknowledged that section 105 confers broad powers on bankruptcy courts:

> [Section] 105 [is] an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction . . . .

*Davis v. Davis (In re Davis),* 170 F.3d 475, 492 (5th Cir. 1999) (citation omitted).

9. The Debtors recognize that section 105(a) of the Bankruptcy Code "may be used only to carry out the provisions of Title 11." *In re CoServ, L.L.C.,* 273 B.R. 487, 494 n.9 (Bankr. N.D. Tex. 2002). The major premise of chapter 11, however, is the continued and uninterrupted

operation of the debtor in possession to the greatest extent possible. Thus, Debtors' requested relief is consistent with the "furtherance of the provisions of the Bankruptcy Code." *Id.*; *see also In re Southmark Corp.,* 113 B.R. 280, 281 (Bankr. N.D. Texas. 1990) (stating that "the court may use [section] 105(a) to fashion orders that are necessary or appropriate to further a substantive provision of the Code").

10. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *Cajun Elec. Power Coop., Inc. v. Official Comm. of Unsecured Creditors (In re Cajun Elec. Power Coop., Inc.),* 119 F.3d 349, 354 (5th Cir. 1997). A debtor must demonstrate sound business judgment for a sale of assets outside of the ordinary course of business. *See, e.g., Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986).

11. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *Cajun Elec. Power Coop., inc. v Official Comm. of Unsecured Creditors (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th cir. 1997). A debtor must demonstrate sound business judgment for a sale of assets outside of the ordinary course of business. *See, e.g., Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).

12. By establishing the Bid Procedures set forth above, the Debtors intend to subject the Quarry Assets to competing bids from buyers interested in purchasing these assets through a fair and transparent process. Such procedures will ensure that the Debtors receive the highest and/or otherwise best value for the Quarry Assets. The fairness and reasonableness of the

consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through an auction process.

13. Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith. . . ." 11 U.S.C. § 363(m). Use of the open and transparent bid process proposed herein ensures a good faith sale. Accordingly, Debtors intend to request a finding of this Court that the Successful Bidder is a "good faith" buyer under section 363(m) of the Bankruptcy Code.

14. If a Stalking Horse Offer is proposed that is acceptable to the Debtors, the Debtors will ask the Court to approve reasonable bid protections that may include break-up fees and expense reimbursements if necessary for the bid. Such bid protections are often used to encourage potential purchasers of assets to invest the requisite time and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives such as break-up fees under the "business judgment rule," which discourages judicial second-guessing of decisions made in good faith and in the exercise of honest judgment by a corporation's board of directors. *In re Integrated Res., Inc.*, 147 B.R. 650, 657-58 (Bankr. S.D.N.Y. 1992), 3 F.3d 49 (2d Cir. 1993) (asking whether (a) the negotiation involved self-dealing or manipulation, (b) the fee hampers, rather than encourages, bidding, and (c) the amount of the fee is reasonable relative to the purchase price).

15. Other bankruptcy courts have also opined on such bid protections. *See*, *e.g.*, *In re America West Airlines, Inc.*, 166 B.R. 908, 91 (Bankr. D. Ariz. 1994) (inquiring into whether the

transaction will "further the diverse interests of the debtor, creditors and equity holders, alike."); *Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 230 B.R. 840, 846-47 (B.A.P. 8th Cir. 1998) (break-up fees are intended to create an incentive for increased bidding). The Third Circuit has articulated the relevant inquiry as whether the break-up fees at issue would be allowable as administrative expenses, i.e., whether the break-up fees are actually necessary to preserve the value of the estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 120-21 (Bankr. D. Del. 2005) (applying standard set forth in *O'Brien*); *see also, In re Phila. Newspapers, LLC*, 2009 Bankr. LEXIS 3167 (Bankr. E.D. Pa. Oct. 8, 2009) (elaborating the three factors considered by the Third Circuit in *O'Brien* as (1) the guarantee of a break-up fee led to more competitive bidding; (2) the bid of the bidder served as a "catalyst" to higher bids; and (3) the promise of a break-up fee enticed a bidder to conduct due diligence on the debtor's value and then proceeded to convert the value to a dollar amount on which other bidders could rely); *In re President Casinos, Inc.,* 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (approving, in part, the requested break-up fee for the actual expenses incurred, and allowing the stalking horse to submit a request for additional break-up fees upon the bidder reaching a definitive purchase price); *In re Twenver, Inc.,* 149 B.R. 954, 956-57 (Bankr. D. Col. 1992) (denying approval of break-up in excess of 10% of proposed purchase price, as hampering potential bidding).

16. While this Court has not adopted a specific test for bid protections, it has approved break-up fees in the past. *See, e.g., In re Physicians Specialty Hospital of El Paso East, L.P.,* Case No. 07-30633-lmc, Doc. No. 194 (Bankr. W.D. Tex. Sept. 26, 2007) (approving a break-up fee and expense reimbursements up to 1% of the purchase price, in the aggregate); *see also In re TXCO Resources, Inc.,* Case No. 09-51807-rbk, Doc. No. 813 (Bankr. W.D. Tex. Nov.

12

30, 2009) (approving a 3% break-up fee). A break-up fee that constitutes a fair and reasonable percentage of the proposed purchase price and that is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible.

17. The Debtors will use their best efforts to negotiate with all Potential Buyers to ensure that any bid protections contained in a stalking horse bid are reasonably designed to: (a) encourage a robust auction process; (b) induce the stalking horse bidder to commit to a purchase; and (c) compensate the stalking horse bidder for the cost, time, and effort spent negotiating the purchase.

**B. Adequate Notice**

18. To ensure that adequate notice of this Motion is provided, Debtors have served this Motion on all parties on the Limited Service List approved by the Court[3] and as such parties are identified, the motion will be served on parties that the Debtors, in consultation with its financial advisors, believe may be interested in becoming Potential Buyers; and all counterparties to the Debtors' executory contracts and unexpired leases that may be included in the sale (collectively, the "Notice Parties").

19. To ensure adequate notice, the Debtors will provide notice of the hearing on this Motion to all Notice Parties.

**V.**
**PRAYER**

WHEREFORE, the Debtors respectfully request that the Court enter an order, (i) approving the Bid Procedures defined herein and entering an order in substantially the same form of the proposed order attached hereto as Exhibit A; (ii) scheduling hearings to approve a Stalking Horse Bidder, if any, consider any objections to cure amounts on leases/contracts to be

---

[3] *See, e.g., Order Granting Motion to Limit Notice and Establish Notice Procedures* [Docket No. 36].

13

3563453.3

assumed as part of the sale, and approve the sale of assets to the Successful Bidder (iii) authorizing the Debtors to conduct an Auction to determine the highest and best offer; (and (iv) granting such other and further relief as this Court deems just and proper under the circumstances.

Dated: September 2, 2011

Respectfully submitted,

**COX SMITH MATTHEWS INCORPORATED**

By: */s/ Mark E. Andrews*_____
    Mark E. Andrews
    State Bar No. 01253520
    George H. Tarpley
    State Bar No. 19648000
    Stephen K. Lecholop II
    State Bar No. 24070119
    1201 Elm Street, Suite 3300
    Dallas, Texas 75270
    (214) 698-7800
    (214) 698-7899 (Fax)

**ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 2nd day of August, 2011, a true and correct copy of the *Motion for Entry of Order (A) Approving the Procedures for Soliciting Offers for Certain of the Debtor's Quarry Assets; (B) Scheduling a Contingent Hearing to Approve a Stalking Horse Bidder and any Bid Protections; (C) Approving Procedures to Set Cure Amounts on Contracts and Leases Related to the Quarry Assets; (D) Authorizing the Debtor to Conduct an Auction of the Quarry Assets; and (E) Granting Related Relief* was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, email and/or via first class U.S. Mail, postage prepaid on the individuals on the Limited Service List dated as of August 29, 2011,

          */s/ Mark E. Andrews*
          Mark E. Andrews

3602533.1

14

3563453.3